IN THE SUPREME COURT OF TENESSEE
AT NASHVILLE
September 30, 2020 Session[1]

**IN RE NEVEAH M.**

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Davidson County**
**No. 16A75    Philip E. Smith, Judge**

_____

**No. M2019-00313-SC-R11-PT**

_____

We granted this appeal to settle a split of authority in the Court of Appeals concerning the proper interpretation of a statute that requires a person seeking termination of parental rights to prove by clear and convincing evidence that a "parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child."  Tenn. Code Ann. § 36-1-113(g)(14) (Supp. 2016); id. (2017 & Supp. 2020).  In some decisions, the Court of Appeals has interpreted this language as requiring clear and convincing proof that a parent was both unable and unwilling to personally assume legal and physical custody or financial responsibility of a child.  See, e.g., In re Ayden S., No. M2017-01185-COA-R3-PT, 2018 WL 2447044, *7 (Tenn. Ct. App. May 31, 2018).  In other decisions, the Court of Appeals has construed this statute as requiring clear and convincing proof that a parent was either unable or unwilling to personally assume legal and physical custody or financial responsibility of a child.  See, e.g., In re Amynn K., No. E2017-01866-COA-R3-PT, 2018 WL 3058280, *14 (Tenn. Ct. App. June 20, 2018).  We hold that the statute is ambiguous and that the latter interpretation—the In re Amynn K. interpretation—best effectuates legislative intent.  Therefore, we overrule In re Ayden S. and all other Court of Appeals' decisions inconsistent with our holding herein.  Additionally, we reverse the decision of the Court of Appeals herein, which applied the In re Ayden S. interpretation, and reinstate the judgment of the trial court terminating mother's parental rights based solely on Tennessee Code Annotated section 36-1-113(g)(14).  In all other respects, the trial court's judgment remains intact and is reinstated.

---

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Trial Court Reinstated as Modified**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Kelli Barr Summers, Brentwood, Tennessee, for the appellants, Christopher G. and Hope G.

Stephen Mills, Nashville, Tennessee, for the appellee, Catherina M.

Thomas H. Miller, guardian ad litem for the child, Neveah M.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Kathryn A. Baker, Senior Assistant Attorney General; Amber L. Seymour, Assistant Attorney General, for the amicus curiae, State of Tennessee.

## OPINION

### I. Factual Background

On August 31, 2016, Christopher G. ("Foster Father") and Hope G. ("Foster Mother") (collectively "Foster Parents") filed a petition for adoption and for termination of the parental rights of Catherina M. ("Mother") to her biological daughter, Neveah M. ("Neveah").[2]  The trial court held a hearing on the petition over three days in April and May 2018, at which ten witnesses testified and multiple documents were introduced into evidence.  Following is a summary of this proof.

Neveah is Mother's seventh child.[3]  Mother, thirty-four-years-old at the time of the hearing, had a long history of drug addiction. During her pregnancy with Neveah, Mother

---

[2] No one was listed as father on Neveah's birth certificate, and Mother was unable to identify the child's father.  Additionally, at the time of the hearing in the trial court, no one had registered as Neveah's father on Tennessee's putative father registry.  Therefore, Mother was the only biological parent listed on the petition.

[3] Mother had given birth to eight children by the time of the hearing but retained custody of only one child—her eighth child, a son, born after Neveah.  The six children born prior to Neveah either were living with their fathers or had been declared dependent and neglected and adopted by non-family members.

had no steady income and worked only sporadically at odd jobs, such as sweeping for $10 an hour at an automotive garage and cleaning a couple of houses. Mother lived on the streets until she was arrested and jailed on drug-related charges, to which she pleaded guilty in October and December of 2013.[4] These plea deals required her to participate in a ninety-day, inpatient drug-treatment program at the Elam Center. Neveah was born on February 23, 2014, while Mother was living at the Elam Center.

Mother completed the program and was discharged from the Elam Center on April 17, 2014. She and Neveah then moved into the home of Mr. Charles Jones. Mr. Jones had met Mother during her pregnancy with Neveah, while she was living on the streets. He checked on her welfare, bought her food, gave her money, and occasionally allowed her to stay the night at his home, because, in Mr. Jones' words, Mother "was messed up." Mr. Jones agreed to allow Mother to move in with him upon her discharge from the Elam Center only after she promised not to return to using drugs. Mother's long-term boyfriend, Mr. Samuel Peoples, paid Mr. Jones $300 per month rent on Mother's behalf.

Mother was not employed while she lived at Mr. Jones' home. She explained that she had been breastfeeding Neveah and had problems pumping milk. Mother also acknowledged, however, that she decided not to participate in job training programs and to be disqualified from working until Neveah was one year old. This decision, Mother explained, allowed her to qualify for and receive government assistance.

For more than a year after her discharge from the Elam Center, Mother evidently kept her promise to Mr. Jones not to return to drug use.[5] Unfortunately, Mother relapsed to drug use in early June 2015, around her birthday on June 6th, and began regularly smoking marijuana cigarettes laced with cocaine. At the hearing below, Mother cited "bad company" and "bad association" as the cause of her relapse. She denied using drugs around Neveah and denied that her drug use impaired her ability to care for Neveah. On the other hand, Mr. Jones recalled Mother staying out on the streets at night while Mr. Peoples cared for Neveah. Mr. Jones described Neveah as often crying for Mother and

---

[4] Mother pleaded guilty on October 8, 2013, and December 23, 2013, to possession or casual exchange of a controlled substance. See Tenn. Code Ann. § 39-17-418 (2018). She also pleaded guilty on December 23, 2013, to unlawful use of drug paraphernalia. See Tenn. Code Ann. § 39-17-425 (2018). Mother could not recall the October 8, 2013 guilty plea. She also had trouble remembering other relevant dates and details. She acknowledged that her long history of drug use may have caused her memory difficulties.

[5] Mr. Jones implied in his testimony that Mother may have returned to drug use before June 2015, but the date of her relapse is not determinative of the issues in this appeal.

being unable to sleep because she wanted Mother. Mr. Jones also recalled Mother breastfeeding Neveah while Mother was using drugs.

In mid-June 2015, the Tennessee Department of Children's Services ("DCS") received a referral regarding Mother's drug use. A DCS worker came to Mr. Jones' home and administered Mother a urine drug screen, which was positive for cocaine. As a result, Mother and DCS entered into an immediate protection agreement. DCS initially placed Neveah with a friend Mother recommended, but this placement was short-lived. On June 29, 2015, Mother and DCS agreed that Jonah's Journey, a program that assists children of incarcerated women, would help with placing Neveah. Jonah's Journey placed Neveah in Foster Parents' physical custody, when Neveah had just turned sixteen months. Mr. Jones recalled crying with relief when Foster Parents came into Neveah's life, explaining that the child "needed help."

Mother was homeless after Neveah was removed from her physical custody, as Mr. Jones would not allow her to remain in his home after she returned to drug use. Although Mother had no money of her own to purchase drugs, she testified that she regularly used whatever drugs others offered her, which mostly consisted of marijuana cigarettes laced with cocaine. Mother denied ever using pills, heroin, or methamphetamines.

Beginning in July 2015, Mother had the opportunity to visit with Neveah one hour each week. Foster Parents, at DCS's direction, supervised the visitation, and visitation occurred either at a McDonald's or a Subway fast-food restaurant. Mr. Jones was Mother's primary means of transportation to and from visitation, although Mother recalled walking on occasion. Mr. Jones stated that Mother sometimes did not want to go to the visits. He explained that "[u]nless it was the first of the month, [Mother] was intoxicated." Mother denied that drug use prevented her from attending visitation. Mr. Jones said that drug use and alcohol use were the only reasons Mother missed visitation.

Mother acknowledged that she did not provide Neveah with financial support from June 2015 until January 2017. However, Mother described giving Foster Parents diapers and food she received from government assistance and free services, and Mother also recalled offering them whatever cash she had, although never more than $20, but she said they never accepted it. Mother maintained that she could not work because she was "ill," "homeless," and "just in a bad place again."

Mother also said that she was unable to work because she had no identification. According to Mother, when DCS removed Neveah from her custody in June 2015, she left her belongings in Mr. Jones' home on a temporary basis until she could get into a drug treatment program. Mother said that she had difficulty retrieving her belongings because Mr. Jones worked twelve hours daily and was rarely home. Mother testified that

- 4 -

her identification was lost when someone placed her belongings on the lawn outside Mr. Jones' home. Mother explained that she did not attempt to obtain new identification because she believed doing so would require her to return to Ohio and would entail a six-to-twelve-week process.

Mr. Jones contradicted Mother's testimony, stating that he had not denied Mother access to his home and had not placed her belongings outside or thrown away her identification. Mr. Jones said that he allowed Mother and Mr. Peoples to remove their belongings from his home and threw away a mattress and other trash that they left behind. Mr. Jones said that Mother's identification was not among the trash left behind. Mr. Jones also denied ever paying any money to Foster Parents for the purpose of satisfying Mother's support obligation. Mr. Jones acknowledged giving Neveah $80 every two weeks, but said that he had given the money to provide for Neveah's needs not to satisfy Mother's support obligation. Mr. Jones also denied ever being romantically or sexually involved with Mother. The trial court described Mr. Jones as a "truthful" and "impressive" witness who appeared to have "Neveah's best interest at heart."

In September 2015, Mother began staying in a vacant house next to Mr. Jones' home. The house was in foreclosure, had no electricity, water, or heat, and Mr. Jones described it as a "rat infested dope thing." Mr. Jones described seeing Mother on the streets "prostituting" and "chasing cars" during this time. Mother agreed that the home had no electricity, water, or heat, but she stated that she had an oil lantern and bottled water, and that Mr. Jones had given her a kerosene heater. Nevertheless, Mother acknowledged that this house was not an appropriate home for Neveah. She also acknowledged that Mr. Peoples paid the owner $100 a month as rent on Mother's behalf. While Mr. Peoples frequently visited and stayed with Mother at this vacant house, he actually resided elsewhere.

DCS administered four drug screens to Mother from July 2015 through January 2016. Mother tested positive for cocaine and marijuana on all of them. A DCS family services worker testified that during this same time, she provided Mother with information about drug treatment programs, with contact information for the vital records office in Ohio so that Mother could obtain her Ohio birth certificate and use it to obtain other forms of identification, and with a bus pass. This DCS worker learned that Mother was pregnant again—this time with Mr. Peoples' child. Yet, the drug screens revealed Mother's continued drug use, and Mother still had failed to enter a drug treatment program. Therefore, consistent with a DCS policy of seeking a status change when a parent fails to enter a needed drug treatment program within 120 days of an initial referral, DCS filed a motion in the Juvenile Court of Davidson County seeking permission to close its noncustodial case based on Mother's noncompliance and to change temporary legal custody of Neveah from Mother to Foster Parents. At the

January 7, 2016 hearing on DCS's motion, Mother told the DCS worker that she had obtained her birth certificate and identification.

On January 15, 2016, the juvenile court filed an order granting DCS's motion. The juvenile court did not explicitly address Mother's visitation rights in the order, but Foster Parents continued Mother's one-hour weekly supervised visitation with Neveah. However, in January 2016, Foster Mother began keeping a written record of Mother's attendance at visitation and testified from this record at the hearing below.

Foster Mother described Mother's attendance at visitation as "consistently inconsistent." In January, Mother visited with Neveah at the January 7, 2016, temporary custody hearing and attended visitation on January 21, 2016, and again on January 28, 2016. Mother missed a scheduled visit on January 14, 2016.

In February, Mother missed visitation on February 4, 2016 and did not call to notify Foster Parents of her absence, although she had phone numbers to reach them. Mother attended visitation on February 11, 2016. Visitation on February 18, 2016, was canceled due to Neveah's illness, but Foster Parents agreed to schedule a visit on February 23, 2016, at the home of Mother's friend, so that Mother could celebrate Neveah's second birthday. Foster Parents arrived with Neveah at the agreed-upon place and time, but Mother was not present. By the time Foster Parents were able to contact Mother twenty minutes later and learn that there had been some sort of misunderstanding,[6] Neveah was tired and hungry. Foster Parents left but met Mother two days later, on February 25, 2016, so that Mother could visit and celebrate Neveah's birthday.

Less than a week later, on March 2, 2016, the juvenile court held a final hearing on custody. Mother failed to appear, despite receiving notice of the hearing. According to Mother, swollen joints and severe nausea prevented her from attending the hearing. Mother also testified that Mr. Jones would not drive her to the hearing and said that she had no other means of transportation. Mr. Jones denied refusing to drive Mother to the hearing and said that he offered to drive her and tried to convince her to attend.

Mother acknowledged that her attorney had informed her that she "needed to be [at the March 2, 2016 hearing] with reasonable effort," but Mother claimed that she had not understood that she "would lose [her] child if [she] didn't go to this court hearing." Mother also claimed that she had called and informed someone at the clerk's office that

---

[6] Mother testified that the friend's boyfriend would not allow Mother to have the party for Neveah at the friend's home.

she would not be able to attend the hearing, but Mother could not recall the name of the person with whom she had spoken. The hearing proceeded, and at some point, Mother's appointed counsel orally moved to withdraw from further representation of Mother. The juvenile court granted the motion.[7]

By an order entered March 14, 2016, the juvenile court ruled that clear and convincing evidence had been presented at the hearing to establish that Neveah was dependent and neglected due to Mother's use of illegal drugs and failure to provide a stable and safe environment for her. The juvenile court awarded Foster Parents legal custody of Neveah and allowed Mother "up to" four hours of supervised visitation per month. The juvenile court also decreed that Mother had lost her superior parental rights to Neveah. Mother received a copy of this order but admitted that she did not read it carefully. Mother knew the order granted her up to four hours of supervised visitation per month, but she did not recall the portion of the order advising of her right to appeal, and Mother did not appeal.

After this hearing, Foster Mother continued keeping a written record of Mother's attendance at visitation. According to Foster Mother, Mother missed a visit on March 3, 2016, and also failed to notify Foster Parents. Mother disputed this testimony and claimed that Mr. Jones had driven her to the March 3, 2016 visit. According to Foster Mother, Mother also missed visitation on March 10, 2016; visitation on March 17, 2016 was canceled, and Mother missed visitation on March 24, 2016, without notifying Foster Parents that she would be absent. Mother attended visitation on March 31, 2016.

At the March 31, 2016 visit, the schedule for future visitation was changed from weekly to bi-weekly, the duration of visitation was changed from one hour to two hours, and the location of visitation was changed from the fast food restaurants to a park located halfway between where Foster Parents lived and where they believed Mother was staying. This park offered a library and a recreation center that could be used in inclement weather. Mr. Jones remained Mother's primary means of transportation to and from visitation.

Foster Mother testified that Mother visited on April 8, 2016, but missed visitation on April 22, 2016, and that Mother attended visitation on May 5, 2016, but did not appear for visitation or call to cancel on May 19, 2016, or June 2, 2016, and that Mother attended visitation on June 16, 2016.

---

[7] The record on appeal includes a copy of the juvenile court's order but does not include a transcript of the hearing.

Foster Mother said that, in addition to Mother's frequent absences from visitation, Mother's comments and behavior during visitation often caused Foster Mother concern that Mother was still abusing illegal drugs. According to Foster Mother, in August 2015, Mother reported that she was again pregnant and that Mr. Peoples was the father. Mother confirmed the pregnancy in December 2015. By February or March 2016, Mother's pregnancy was evident from her physical appearance, yet, Mother also appeared to be under the influence of drugs during some of the visits, as her behavior was "lethargic, kind of out of sorts." At one visit, Foster Mother noticed "like open wounds" on Mother's arm. Mother also "talked many times about going to the emergency room for this thing or that thing."

Foster Mother also recalled Mother saying unusual things during the visits. For example, during an April or May 2016 visit, Mother remarked that she liked to keep her children about eighteen months, although Mother did not give a reason for this preference. Foster Mother also recalled Mother asking, more than once, whether Foster Parents would consider adopting her unborn child. According to Foster Mother, Mother also remarked that she was tired of being pregnant and that "she was trying to go ahead and have him."

Mother disputed Foster Mother's testimony and denied asking Foster Parents to adopt her unborn child or saying anything about ending her pregnancy early. Mother admitted that she may have talked about having a difficult pregnancy, explaining that she had severe preeclampsia during her eighth pregnancy. Mother also admitted to using illegal drugs during the pregnancy, but she denied that her drug use caused preeclampsia. Mother also claimed that she did not intentionally use drugs during her pregnancy and simply did not know that she was pregnant until shortly before she gave birth to her eighth child. Mr. Peoples, on the other hand, contradicted Mother's testimony and said that he and Mother had learned she was pregnant in January 2016. And, the DCS worker also testified that she learned of Mother's pregnancy before the January 7, 2016 hearing at which DCS was allowed to close its noncustodial case.

Mother also disputed Foster Mother's testimony regarding Mother's attendance at visitation. Mother estimated that she possibly missed six visits between July 2015 and March 2016. Mother attributed her absences to poor health and lack of transportation and denied that alcohol or drug abuse played any role. Again, Mr. Jones contradicted Mother's testimony and said her drug and alcohol abuse was the sole reason she missed visitation and that he never refused to transport her. Moreover, the DCS worker also testified that she gave Mother a bus pass to aid with her transportation needs prior to the January 7, 2016 hearing.

During the course of the hearing, the trial court advised Mother, after watching her testify "for the better part now of - - well, over three hours," that she was "one of the

worst witnesses that ha[d] ever come before [the trial court]." The trial court remarked, "And I will tell you, ma'am, I don't believe much of what you're telling me right now." The trial court also advised Mother more than once that she seemed to be blaming others for her actions, inactions and situation.

In any event, the hearing proceeded, and the proof showed that Mother gave birth to her eighth child, a son, Cairo, on June 27, 2016. Both Mother and Cairo tested positive for cocaine at his birth, so DCS again became involved with Mother's family. On June 30, 2016, Mother called and informed Foster Mother that she had recently given birth to a son and asked Foster Mother to bring Neveah to the hospital to meet her brother. When Mother called, Foster Mother and Neveah were on their way to the park for visitation with Mother, but Foster Mother declined to take Neveah to the hospital, explaining that the family's existing plans could not be changed.

On July 1, 2016, upon their discharge from the hospital, DCS arranged for Mother and Cairo to move to the Elam Center and for Mother to again enter the inpatient drug-treatment program. Foster Mother testified that Mother called her twice in July, on Saturday morning, July 9, 2016, and Saturday morning, July 23, 2016. Both times Mother asked Foster Mother to bring Neveah to the Elam Center for family visitation from 2:00 to 4:00 p.m. later those same days. Foster Mother declined on both occasions, explaining that the family could not change their existing plans for those days, including, on one day, attending a wedding. According to Foster Mother, Mother did not ask to schedule visitation for another time and did not call again. For the rest of July and August 2016, Foster Parents went to the park for visitation at the agreed-upon time, every other week, and waited fifteen-to-twenty minutes. They left when Mother neither showed up nor called to notify Foster Parents that she would not be coming.

Mother contradicted Foster Mother's testimony and stated that she had called Foster Parents from the Elam Center about visitation, "at least five times a week." Mother testified that she used every telephone call she was permitted to call Foster Parents but never heard back from them. Mother testified that patients were not generally permitted to leave the facility without supervision. Mother acknowledged, however, that she could have given advance notice and sought approval of the clinical director to leave the facility for visits, but she did not do so. According to Mother, Foster Parents knew she was residing at the Elam Center and participating in the inpatient drug-treatment program and should have known that she would not be able to attend visitation at the park. Mother testified that she had "been calling [Foster Parents] since the day [she] gave birth to [her] son" and that she called "from 5:00 [p.m.] . . . to say 8:30/9:00 [p.m.] when [she] would go to bed," estimating that she called, "[m]aybe twice a day daily for those four months." Mother stated that she called "through the center's line" because she did not have a personal phone. Mother said that she was allowed to use the phones of three

or four people who were working her case because they considered Mother's inability to contact Foster Parents a crisis.

Samuel Scales, clinical director of the Elam Center, testified that he allowed Mother to call Foster Parents from his office telephone two or three times while she was living at the Elam Center in 2016, but she was unable to reach them.

Meanwhile, on July 11, 2016, after Mother moved to the Elam Center, Neveah's juvenile court guardian ad litem filed a petition in juvenile court seeking to terminate Mother's parental rights. About a month later, on August 15, 2016, Mother filed a motion in the juvenile court seeking visitation and reunification with Neveah. Then, on August 31, 2016, Foster Parents filed in the Circuit Court for Davidson County the petition for adoption and termination of Mother's parental rights from which the present appeal arises.

On September 13, 2016, Mother filed a document in the circuit court titled "Resume Visitation," seeking to "[e]xercise [her] parental rights to visit [her] child in hopes of being reunified as soon as possible." At a September 30, 2016 hearing on this motion, Mother and Foster Parents announced their agreement to resume two-hour visitation every other Thursday, beginning October 6, 2016, with visitation supervised by Foster Parents. An order reflecting the parties' agreement was entered on December 28, 2016.

On October 30, 2016, Mother and Cairo were discharged from the Elam Center to a women's shelter. On November 15, 2016, Mother, Mr. Peoples, and Cairo moved into a single bedroom of a rooming house, where they shared a bathroom and kitchen with other residents. Mother completed work training and obtained employment on November 25, 2016.

In January 2017, Mother began providing Foster Parents with financial support for Neveah, beginning with $50 every other week for a few weeks but dropping down to $30 every other week through the time of the hearing. Mother also brought clothing and food for Neveah to visitation.

In September 2017, Mother, Mr. Peoples, and Cairo moved into a two-bedroom apartment in Nashville, and Mr. Peoples paid the monthly rent of $574. Mother acknowledged that Mr. Peoples had previously been convicted of selling cocaine to a police officer.

At the hearing below, Mother's case manager from Mental Health Cooperative in Nashville, Ms. Raven Starks, testified that Mother began receiving mental health services at their organization in May 2017. Mother's diagnosis was major depressive disorder.

Ms. Starks said that she and Mother had spoken by telephone at least once each month since May 2017 and had met face-to-face at least once a quarter. Ms. Starks managed Mother's mental and physical health, living arrangements, and "any other goals that she wants to accomplish, such as jobs or anything like that." Concerning Mother's mental health, Ms. Starks scheduled Mother's appointments with any mental health provider and ensured that Mother was attending therapy appointments when she was not seeing a provider. At the time of the hearing, Mother was attending therapy sessions once or twice a month and had faithfully attended every appointment and was not then taking prescription medication. As far as Ms. Starks knew, Mother was in compliance with her mental health provider's requirements. Ms. Starks testified that, with respect to Mother's physical health, Mother's goals were to exercise daily and see a doctor as needed. Mother had no physical health concerns requiring doctor visits, and she had met her goal of exercising and had lost ten pounds within the preceding five months.

Ms. Starks testified that she had visited Mother's various residences and that they were neat and clean at every visit. She said that Mother's two-bedroom apartment had beds and dressers in them and that all seemed to be in order. Ms. Starks stated that the home was adequate for minor children and that she had no concerns about the safety of the home. Ms. Starks had not seen any evidence of any kind of illegal drug or alcohol use or domestic violence in the home. Ms. Starks also had observed Mother caring for Cairo and said that they seemed to have normal parent-child interaction and that Cairo was always clean, well-kept, and well-fed on the days she had seen him. Ms. Starks testified that she had no concerns about Mother's ability to care for Cairo.

At the time of the hearing below, Mother was employed at the Nashville Aquarium earning $11 an hour and had worked there since January 18, 2018. Mother had been employed since November 2017. Mother maintained that she was capable of paying the rent and expenses of the apartment she shared with Cairo and Mr. Peoples, although she acknowledged that Mr. Peoples was still paying their rent and expenses at the time of the hearing.

A number of the witnesses at the hearing testified about Neveah's relationship with Foster Parents and Mother. For example, Mr. Jones testified that Neveah loves Foster Parents and that she had changed from a crying child in need of a caretaker to a happy and joyful child. Referring to Foster Mother, Mr. Jones stated:

> Oh, man. That's momma bear there. You can't - - she hugs on her. She squeezes on her. She cuts me and [Foster Father] off, you know. But, you know, she's a good little baby. She just hugs you and kisses you and gives you so much love, you know. And I just don't understand. She's been with them for all this time, you know. And why do this to her? You know, she's innocent.

- 11 -

Mr. Jones stated that Neveah turns to Foster Mother, not Mother, during visitation when she is hungry, upset, or in need of a bathroom break or anything else. According to Mr. Jones, Neveah shows more affection for Mr. Peoples than for Mother.

Jennifer Johnson, Foster Mother's sister, lived in the same household as Foster Parents and Neveah and testified that Neveah views Foster Mother as "Mommy" and wants Foster Mother or Foster Father to care for her at bedtime and when she falls, does not feel well, or is hurt. Ms. Johnson said Neveah loves Foster Father and loves for him to drop her off and pick her up from school and also loves to "play cars" with Foster Father. Ms. Johnson described occasionally babysitting Neveah and said that Neveah, referring to Foster Parents, would ask, "Where's Mommy and Daddy?" When are they coming back?" Ms. Johnson had attended two or three of Neveah's visits with Mother in November 2017 and had described Mother, Cairo, and Neveah playing together without much interaction, much like a playdate. Ms. Johnson said that Neveah is always glad to see Cairo, but, when Neveah returns from visits with Mother, the child generally does not want to talk and tends to be tired, angry, and not in a good mood. Ms. Johnson said that, on a few occasions, she has heard Neveah screaming or crying out in the night after visits.

Foster Mother also testified about Neveah's relationship with Mother. Foster Mother stated that, from the time regular visitation stopped when Mother entered the Elam Center in July 2016, Neveah stopped calling Mother "mommy" or "mom" and that when visitation resumed in October 2016, Neveah called Mother by her nickname, "Cat." Asked to describe any changes in the bond between Neveah and Mother, Foster Mother testified that "the bond definitely decreased while [Mother] was not doing her visitations." Foster Mother also related that Neveah has significant food allergies, which she explained to Mother, yet Mother continued for a while bringing inappropriate foods to visits for Neveah but eventually "g[o]t on board" with the child's restricted diet.

Foster Mother said that Neveah calls Foster Mother "Mommy" and that, when Neveah falls or hurts herself during visitation, Neveah always turns to Foster Mother for reassurance and care, not to Mother. Foster Mother said that Neveah also always turns to her, not Mother, when she needs to go to the bathroom or is hungry during visitation. Foster Mother said that Neveah is more excited at visitation to see Mr. Peoples or Mr. Jones than Mother.

Foster Mother described Neveah as having an outgoing, bubbly personality, although the child tends to be "a little bit more reserved" around Mother. Foster Mother said that Neveah is initially happy to see Mother but returns to Foster Mother frequently during visitation to check in and needs to know where Foster Mother is at all times during visitation. Foster Mother explained that Neveah typically wants to leave visitation early,

sometimes between forty-five minutes and an hour and a half. Foster Mother said that Neveah is at times resistant when Mother asks for a hug, but complies with the request at Foster Mother's urging, but is more comfortable with Mr. Peoples and freely hugs him. Foster Mother described Mother's and Neveah's relationship as that of playmates.

Foster Mother related that Neveah never asks or talks about Mother apart from visitation. Foster Mother acknowledged that Neveah enjoys seeing and playing with Cairo and is aware that he is her brother. But, according to Foster Mother, Neveah becomes jealous if Foster Mother holds Cairo and will come up and ask Foster Mother to hold her too. Foster Mother related how Mother took Neveah's hand to walk to the library at the park, but after only about five steps, Neveah dropped her hand and came over and grabbed Foster Mother's hand. Foster Mother stated that Mother "[v]ery rarely" calls to talk to Neveah, although she acknowledged that Mother had called Neveah in 2017 on her birthday, had left a message for Neveah on Halloween in 2017, while she and Foster Parents were out trick or treating, and had called late on Christmas 2017, after Neveah had gone to bed. Foster Mother denied ever telling Mother that she did not have to pay child support. Foster Mother also agreed that Mother had provided a few gifts at Christmas and for Neveah's birthday prior to January 2017.

Mother, on the other hand, testified that Neveah knows she is her mother, and Mother described visitation with Neveah as meaningful and enjoyable, consisting of Mother talking with Neveah, hugging, kissing, praying, and singing with Neveah, playing cards and games with Neveah, and learning about what Neveah is doing in her education.

Foster Mother described Neveah's activities, relating that she attends daycare and does well there, attends church and "very much loves the children's pastor and all of the children's workers," and attends dance class on Saturday mornings. When asked to describe Neveah's attachment to her, Foster Mother stated:

> I am her mommy. She comes to me if she doesn't feel good. If she has a nightmare in the middle of the night, she comes to me. If—excuse me—but if she needs to have her butt wiped, she calls for mommy to come and wipe her butt.

At the time of the hearing, Foster Mother was employed in the health insurance business, where she had worked for twenty years. She had no physical or mental conditions to prevent her from caring for Neveah. Foster Parents' home was clean, safe, spacious, and stable, and Neveah had her own room. Foster Mother also testified that Neveah is integrated into their extended family and has good relationships with Foster Parents' parents and siblings and with Foster Mother's niece.

Although Foster Mother had no reason to believe that Mother was using drugs at the time of the hearing and did not view Mr. Peoples as any sort of a threat to Neveah, Foster Mother believed that removing Neveah from Foster Parents' home would be psychologically harmful to Neveah. Foster Mother testified that Neveah "would be devastated to leave our home, as she considers us her primary caregivers." Foster Mother could not recall Neveah ever saying anything to indicate that she remembered living anywhere other than at Foster Parents' home. Foster Mother said that Neveah still experienced night terrors occasionally, but less frequently.

Foster Mother said that Neveah enjoys playing with Foster Father and spending time with him at the park and "going outside and playing ball with him or riding her little bike up and down the streets." Foster Mother related that Neveah refers to Foster Father as "Daddy."

Foster Father, who also had attended most of the visitations, testified and expressed agreement with Foster Mother's testimony and with her description of Neveah's and Mother's interaction. Asked about his relationship with Neveah, Foster Father stated that they talk together, that Neveah asks him about clouds, that she loves music, that they play music she likes and sing together, that they play together, take walks together, swing together, and enjoy being outside in the sunshine together. Foster Father explained that Neveah attends his family gatherings and has relationships with his family members, as well as with Foster Parents' neighbors. Foster Father described her as "thriving" in Foster Parents' home. Foster Father believed terminating Mother's parental rights would be in Neveah's best interests and would relieve Neveah from being anxious that her situation could change.

At the time of the hearing, Foster Father was employed as a supervisor of the deli department with the Kroger Company, where he had worked for thirty-one years. He had no physical, mental, or medical conditions that would prevent him from providing care to Neveah.

Ms. Robin Wilson, Mother's fifty-seven-year-old first cousin, who worked as chief investigator for the City of Toledo's Office of Diversity Inclusion, traveled from Ohio to testify at the hearing. Ms. Wilson and three more of Mother's relatives—Mother's sister, brother, and aunt—had learned of Mother's situation while organizing a family reunion, three or four months earlier. Ms. Wilson had never met Neveah and actually had not been in contact with Mother for eight to ten years before learning of Mother's situation only a few months earlier. Ms. Wilson was unaware of Mother's drug use, mental health issues, and other six children. Nevertheless, Ms. Wilson expressed her willingness to petition for guardianship of Neveah or to support Mother should Mother regain custody of Neveah. Mother's attorney stated that Ms. Wilson's testimony was representative of the testimony that Mother's other Ohio relatives would have provided

had they been called to testify, and the trial court accepted counsel's characterization of the proof.

At the close of the proof, the trial court took the matter under advisement, rendered a verbal decision on September 20, 2018, and entered its written order on January 31, 2019, including findings of fact and conclusions of law. The trial court found that the following three statutory grounds alleged in the petition for terminating Mother's parental rights had been proven by clear and convincing evidence: (1) abandonment by willful failure to visit during the four consecutive months immediately preceding the filing of the petition to terminate pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i) (Supp. 2016); (2) abandonment by willful failure to support during the relevant four-month period pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i); and (3) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the child and such custody would pose a risk of substantial harm to the child pursuant to Tennessee Code Annotated section 36-1-113(g)(14) (2017 & Supp. 2020).[8] Concerning this third ground for termination, the trial court stated:

> At the time the petition was filed, [Mother] was not visiting with [Neveah]. She had no income. No job. No long-term stable housing. [Mother] was completely dependent on the goodness of others to provide for her daily needs. This Court finds by clear and convincing evidence that [Mother] has failed to manifest an ability to personally assume legal and physical custody of [Neveah] or [financial] responsibility of the child. The court further finds that [Foster Parents] have provided for [Neveah] since June 29th of 2015. [Neveah] has bonded with both [Foster Mother and Foster Father]. [Neveah] has certainly not bonded with [Mother]. [Mother], during at least part of the summer of 2016, was still testing positive for drug use. The Court will note that the baby Cairo she gave birth to in June of 2016 tested positive for illegal drugs. The Court finds by clear and convincing evidence that placing physical custody of [Neveah] with [Mother] at the time the petition was filed would pose a severe risk of physical and psychological harm to [Neveah]. The Court finds by clear and convincing evidence that [Foster Parents] have satisfied the ground alleged as substantial harm found at T[ennessee Code Annotated section] 36-1-113(g)(14).

---

[8] The statutory language of Tennessee Code Annotated section 36-1-113(g)(14) has not changed in a material way since Foster Parents filed this petition, so citations in this opinion are to the current statute.

- 15 -

The trial court also ruled that the proof offered amounted to clear and convincing evidence that termination of Mother's parental rights was in Neveah's best interests.

Mother appealed, and the Court of Appeals reversed. The intermediate appellate court overturned the trial court's findings as to all three statutory grounds for termination of Mother's parental rights. As to the first two statutory grounds, the Court of Appeals held that Foster Parents had failed to prove by clear and convincing evidence that Mother willfully failed to visit or willfully failed to support Neveah during the four months preceding the filing of their petition. [9] In re Neveah M., No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *14–15 (Tenn. Ct. App. Mar. 4, 2020), perm. app. granted, (Tenn. June 15, 2020). As for the third statutory ground the trial court relied upon, the Court of Appeals interpreted the statute as requiring Foster Parents to prove by clear and convincing evidence that Mother lacked both an ability and a willingness to personally assume legal and physical custody or financial responsibility of the child. Id. at *16–17. Relying on an earlier intermediate appellate court decision, the Court of Appeals held that "[i]f a party [seeking to terminate parental rights] proves only the 'ability' criterion or the 'willingness' criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights." Id. at *16 (citing In re Ayden S., 2018 WL 2447044, at *7). Based on its conclusion that Foster Parents had failed to prove any statutory ground for termination of Mother's parental rights, the Court of Appeals declined to address whether termination of Mother's parental rights was in Neveah's best interests. Id. at *17.

Foster Parents filed an application for permission to appeal in this Court pursuant to Tennessee Rule of Appellate Procedure 11, raising three issues, two of which challenged the Court of Appeals' determination that Tennessee Code Annotated section 36-1-113(g)(14) required them to prove that Mother lacked both the ability and the willingness to personally assume legal and physical custody or financial responsibility of Neveah. We granted Foster Parents' application but limited the grant to the two issues relating to the proper construction of section 36-1-113(g)(14). Order, In re Neveah M.,

---

[9] As the Court of Appeals pointed out, the statutes establishing these grounds for termination were amended after Foster Parents filed their petition so that the absence of willfulness is now an affirmative defense to abandonment for failure to visit or support, which a parent or guardian bears the burden of establishing by a preponderance of the evidence. In re Neveah M., No. M2019-00313-COA-R3-PT, 2020 WL 1042502, at *14 n.7 (Tenn. Ct. App. Mar. 4, 2020) (discussing Tenn. Code Ann. § 36-1-102(1)(A)(i), -102(1)(I) (Supp. 2020)), perm. app. granted, (Tenn. June 15, 2020). The Court of Appeals declined to apply this revised statute retroactively. Id. Foster Parents have not challenged this part of the Court of Appeals' decision.

No. M2019-00313-SC-R11-PT (Tenn. June 15, 2020) (granting application for permission to appeal).

## II. Standard of Review

Rule 13(d) of the Tennessee Rules of Appellate Procedure supplies the standard that governs an appellate court's review of a trial court's determination in a parental termination proceeding. In re Carrington H., 483 S.W.3d 507, 523–24 (Tenn. 2016) (citing In re Bernard T., 319 S.W.3d 586, 596 (Tenn. 2010); In re Angela E., 303 S.W.3d 240, 246 (Tenn. 2010)). Under Rule 13(d), appellate courts review factual findings de novo with a presumption of correctness, unless the evidence preponderates otherwise. Id. at 524 (citing In re Bernard T., 319 S.W.3d at 596; In re M.L.P., 281 S.W.3d 387, 393 (Tenn. 2009); In re Adoption of A.M.H., 215 S.W.3d 793, 809 (Tenn. 2007)). A trial court's determination as to whether facts amount to clear and convincing evidence supporting termination of parental rights is a conclusion of law. Id. (citing In re M.L.P., 281 S.W.3d at 393). As such, an appellate court reviews this determination de novo, affords no deference to the trial court's decision, and makes its own determination about whether the facts amount to clear and convincing evidence of the elements necessary to terminate parental rights. Id. (citing In re Bernard T., 319 S.W.3d at 596–97). The issue of statutory construction presented in this appeal also is a question of law, which we review de novo with no presumption of correctness. Johnson v. Hopkins, 432 S.W.3d 840, 844 (Tenn. 2013).

## III. Analysis

### A. Ground for Termination

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." In re Carrington H., 483 S.W.3d at 521. Parental rights have been described as "far more precious than any property right." Id. at 522 (internal quotation marks omitted) (quoting Santosky v. Kramer, 455 U.S. 745, 758-59, (1982)). But parental rights are not absolute. Id. (citing In re Angela E., 303 S.W.3d at 250). In Tennessee, parental rights may be terminated if a party proves two elements by clear and convincing evidence: (1) that at least one statutory ground for termination exists, Tenn. Code Ann. § 36-1-113(g) (listing the grounds for terminating parental rights); and (2) "[t]hat termination of the parent's or guardian's rights is in the best interests of the child," id. § 36-1-113(c)(2) (2017 & Supp. 2020). "The best[-]interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254 (citing In re Marr, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). We thus begin our

analysis with whether Foster Parents offered clear and convincing evidence to establish a statutory ground for terminating Mother's parental rights.

The only statutory ground for termination on which Foster Parents rely in this Court is section 36-1-113(g)(14), which provides that a party seeking to terminate parental rights must establish by clear and convincing proof that:

> [a legal] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Two prongs must be proven by clear and convincing evidence to terminate parental rights under this statute: (1) the parent or legal guardian failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. This appeal focuses on the proper construction of the first prong of this statute.

The interpretation the Court of Appeals applied in this case originated in a 2018 decision—In re Ayden S., No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). There, the Court of Appeals held that the first prong of section 36-1-113(g) requires clear and convincing evidence of both a parent's inability *and* unwillingness to assume custody or financial responsibility for the child. Id. In In re Ayden S., the proof showed that the parents manifested a willingness to assume legal and physical custody of the children but lacked the ability to do so. Id. Therefore, the Court of Appeals reversed the trial court's decision terminating parental rights. Id. The Court of Appeals has applied the In re Ayden S. interpretation in a number of subsequent decisions. See, e.g., In re Justin D., No. E2019-00589-COA-R3-PT, 2020 WL 4473032, at *13 (Tenn. Ct. App. Aug. 4, 2020), perm. app. filed, (Tenn. Oct. 2, 2020); In re Allyson P., No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *11 (Tenn. Ct. App. June 17, 2020); In re Isabella W., No. E2019-01346-COA-R3-PT, 2020 WL 2070392, at 12 (Tenn. Ct. App. Apr. 29, 2020), perm. app. filed, (Tenn. June 6, 2020); In re Eli S., No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *8 (Tenn. Ct. App. Apr. 9, 2020); In re Zaylee W., No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020); In re Keilyn O., No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018).

However, less than a month after the Court of Appeals decided In re Ayden S., another panel of the Court of Appeals interpreted the first prong of section 36-1-

113(g)(14) as applying upon clear and convincing proof that a parent was either unable or unwilling to assume custody or financial responsibility for a child. In re Amynn K., 2018 WL 3058280, at *14. The Court of Appeals stated:

> [T]he first prong of Tennessee Code Annotated [section] 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

In re Amynn K., 2018 WL 3058280, at *14. Stated differently, "the parent must have 'manifest[ed], by act or omission, an ability and willingness.'" Id. at *13 (quoting Tenn. Code Ann. § 36-1-113(g)(14)). In re Amynn K. stands for the proposition that the first prong of section 36-1-113(g)(14) requires a parent to manifest both ability and willingness and, therefore, is satisfied by clear and convincing proof of a parent's failure to manifest either.

More recent decisions of the Court of Appeals have endorsed the In re Amynn K. interpretation and have rejected the In re Ayden S. construction. See, e.g., In re Braelyn S., No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *15 (Tenn. Ct. App. July 22, 2020), perm. app. filed, (Tenn. Sept. 18, 2020); In re Jeremiah S., No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *7 (Tenn. Ct. App. Apr. 23, 2020), perm. app. filed, (Tenn. June 19, 2020); In re H.S., No. M2019-00808-COA-R3-PT, 2020 WL 1428777, *10 (Tenn. Ct. App. Mar. 20, 2020); In re Bentley Q., No. E2019-00957-COA-R3-PT, 2020 WL 1181804, at *10 (Tenn. Ct. App. Mar. 11, 2020); In re Serenity S., No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *16 (Tenn. Ct. App. Jan. 31, 2020); In re Bryson B., No. E2019-00729-COA-R3-PT, 2019 WL 6487241, at *10 (Tenn. Ct. App. Dec. 2, 2019); In re Jayda H., No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019); In re Mickeal Z., No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *14 (Tenn. Ct. App. Jan. 25, 2019); In re Alexis S., No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *10 (Tenn. Ct. App. Nov. 30, 2018); In re Steven W., No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *23 (Tenn. Ct. App. Nov. 28, 2018); In re Savanna I., No. E2018-00392-COA-R3-PT, 2018 WL 6167386, at *14 (Tenn. Ct. App. Nov. 26, 2018); In re Alexis C., No. M2017-02052-COA-R3-PT, 2018 WL 4092048, at *11 (Tenn. Ct. App. Aug. 28, 2018).

In one of these recent decisions, In re Braelyn S., E2020-00043-COA-R3-PT, 2020 WL 4200088, at *15 (Tenn. Ct. App. July 22, 2020), perm. app. filed, (Tenn. Sept. 18, 2020), the Court of Appeals comprehensively examined the strengths and weaknesses of the divergent statutory interpretations and concluded that this disagreement among the judges of the Court of Appeals about the proper construction of the first prong of section

36-1-113(g)(14) illustrates that the statutory language is ambiguous. We agree with this assessment.

> In construing statutes, we are guided by the following oft-repeated rules.
>
> First, the most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. To fulfill this directive, we begin with the statute's plain language. When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use. A statute is ambiguous when the parties derive different interpretations from the statutory language. However, this proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute. In other words, both interpretations must be reasonable in order for an ambiguity to exist. If an ambiguity exists, however, we may reference the broader statutory scheme, the history of the legislation, or other sources to determine the statute's meaning. We avoid constructions that place one statute in conflict with another and endeavor to resolve any possible conflict between statutes to provide for a harmonious operation of the laws.

State v. Frazier, 558 S.W.3d 145, 152–53 (Tenn. 2018) (citations, quotation marks, and alterations omitted). Here, although the Court of Appeals has interpreted the same statute in fundamentally different ways, neither interpretation is nonsensical or clearly erroneous. Therefore, we conclude that the statutory text is indeed ambiguous and will proceed, as did the intermediate appellate court in In re Braelyn S., to reference the statute's legislative history and adopt an interpretation that best effectuates legislative intent. Frazier, 558 SW.3d at 152–53.

Section 36-1-113(g)(14) was enacted in 2016 as part of a bill focused on amending title 36 relative to adoption. Act of April 27, 2016, ch. 919, § 20, 2016 Tenn. Pub. Acts 919. According to one of the bill's sponsors, its purpose was to bring clarity to Tennessee adoption law and facilitate adoptions. Representatives of the Tennessee Administrative Office of the Courts, the Tennessee Department of Children's Services, private adoption agencies, and adoption attorneys substantially assisted in drafting the legislation. Hearing on H.B. 1369 Before the H. Civil Justice Subcomm., 109th Gen. Assemb. (Tenn. Mar. 21, 2016) (statement of Rep. John Mark Windle). At a March 29, 2016 hearing of the Civil Justice Committee of the Tennessee House of Representatives, Nashville adoption attorney Ms. Lisa Collins testified, and, at the request of the Administrative Office of the Courts, described "the legislative intent" of the language now codified as section 36-1-113(g)(14), the statute at issue in this appeal. Hearing on

<u>H.B. 1369 Before the H. Civil Justice Subcomm.</u>, 109th Gen. Assemb. (Tenn. Mar. 21, 2016) (testimony of Ms. Lisa Collins).

Ms. Collins explained that the legislative intent of this language is to permit termination of parental rights upon proof of a parent's or guardian's "long term <u>either</u> inability or unwillingness to provide for a child that is biologically . . . or legally yours, . . . and such conduct leads to harm to a child." <u>Hearing on H.B. 1369 Before the H. Civil Justice Subcomm.</u>, 109th Gen. Assemb. (Tenn. Mar. 21, 2016) (testimony of Ms. Lisa Collins) (emphasis added). After Ms. Collins testified, the legislation unanimously passed the House Committee, and, during the subsequent legislative process that culminated in passage of the bill, Ms. Collins' statement of legislative intent was neither questioned, supplemented, nor contradicted. Therefore, the expressed legislative intent for section 36-1-113(g)(14) is to require clear and convincing proof that a parent or legal guardian was <u>either</u> unable or unwilling to personally assume legal and physical custody or financial responsibility of a child.

This expressed legislative intent of section 36-1-113(g)(14) also is consistent with our discussion in <u>In re Bernard T.</u>, 319 S.W.3d 586, 604 (Tenn. 2010), of nearly identical language in a different statute permitting termination of the rights of a putative father who "has failed to manifest an ability and willingness to assume legal and physical custody of the child[.]" Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv). Although our discussion of this language was not dispositive of the <u>In re Bernard T.</u> appeal, this Court affirmed termination of parental rights where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." 319 S.W.3d at 604. We concluded that the father's "testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." <u>Id.</u> at 604–05.

Therefore, we conclude that section 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied. <u>In re Amynn K.</u>, 2018 WL 3058280, at *13.

Accordingly, for all these reasons, we adopt the <u>In re Amynn K.</u> interpretation of the first prong of section 36-1-113(g)(14). We overrule <u>In re Ayden S.</u> and any other Court of Appeals' decisions inconsistent with this opinion. Applying the <u>In re Amynn K.</u> interpretation, we agree with the trial court that Foster Parents have presented clear and convincing proof to establish the ground for termination provided in section 36-1-113(g)(14). Mother has not argued in this Court that Foster Parents failed to satisfy the

second prong of section 36-1-113(g)(14), which required clear and convincing proof that "placing [Neveah] in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of [Neveah]." Tenn. Code Ann. § 36-1-113(g)(14). The proof on this statutory requirement is largely unrefuted. Foster Mother, Foster Father, Mr. Jones, and Foster Mother's sister testified that Neveah has bonded with Foster Parents, views them as her parents and primary caregivers, does not view Mother as her parent, does not remember residing anywhere else, and would be psychologically devastated were she separated from Foster Parents. The trial court explained its finding of the statutory ground for termination as follows:

> At the time the petition was filed, [Mother] was not visiting with [Neveah]. She had no income. No job. No long-term stable housing. [Mother] was completely dependent on the goodness of others to provide for her daily needs. This Court finds by clear and convincing evidence that [Mother] has failed to manifest an ability to personally assume legal and physical custody of [Neveah] or [financial] responsibility of the child. The court further finds that [Foster Parents] have provided for [Neveah] since June 29th of 2015. [Neveah] has bonded with both [Foster Mother and Foster Father]. [Neveah] has certainly not bonded with [Mother]. [Mother], during at least part of the summer of 2016, was still testing positive for drug use. The Court will note that the baby Cairo she gave birth to in June of 2016 tested positive for illegal drugs. The Court finds by clear and convincing evidence that placing physical custody of [Neveah] with [Mother] at the time the petition was filed would pose a severe risk of physical and psychological harm to [Neveah]. The Court finds by clear and convincing evidence that [Foster Parents] have satisfied the ground alleged as substantial harm found at T[ennessee Code Annotated section] 36-1-113(g)(14).

The evidence does not preponderate against the trial court's factual findings. Furthermore, based on our de novo review, we conclude that the facts amount to clear and convincing evidence of the statutory ground for relief in Tennessee Code Annotated section 36-1-113(g)(14).

## B. Best-Interests Analysis

Having concluded that Foster Parents presented clear and convincing evidence of a statutory ground for termination of Mother's parental rights, we turn next to review the trial court's finding that Foster Parents established that terminating Mother's parental rights is in Neveah's best interests. Mother has not challenged the trial court's finding on this point, but we are obligated to review it. In re Carrington H., 483 S.W. 3d at 525.

Any best-interests analysis necessarily begins with the statutory factors listed in Tennessee Code Annotated section 36-1-113(i) (2017 & Supp. 2020), which states:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent

the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

These statutory factors are non-exclusive, and courts may also consider any other proof offered at a termination proceeding that is relevant to the best-interests analysis. In re Gabriella D., 531 S.W.3d 662, 681–82 (Tenn. 2017) (citing In re Carrington H., 483 S.W.3d at 523); In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). "The child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id.

> [W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed.

Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Gabriella D., 531 S.W.3d at 682 (quoting In re Audrey S., 182 S.W.3d at 878). It involves more than simply "tallying the number of statutory factors weighing in favor of or against termination." Id. (citing White v. Moody, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004)). The unique facts and circumstances of each case dictate the weight and relevance that a court should afford each statutory factor. Id. The best-interests analysis remains a factually intensive undertaking. Id. (citing In re Carrington H., 483 S.W.3d at 523). A court must consider all the statutory factors but may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors. Id.

Here, in concluding that termination of Mother's parental rights was in Neveah's best interests, the trial court considered all nine statutory factors, but it ascribed the most weight and relevance to three statutory factors, explaining, in relevant part:

> 1. Whether a meaningful relationship has otherwise been established between the parent or guardian and the child; the issue is whether the relationship is meaningful. For many months, [Mother] was very sporadic with her visitation. As a result, she missed out on crucial time needed for

her to maintain a bond with Neveah. Neveah needs to have an adult step into the role of parent. And during this period, [Mother] was unavailable to assume that role. The minor child could not put its life on hold for three years for [Mother] to decide that she is ready to parent. Instead Neveah naturally bonded with [Foster Parents]. Even now during the visitations, the child looks to [Foster Parents] for her needs and sees [Mother] more as someone she plays with every couple of weeks. The loss of an infrequent playmate would not be devastating to Neveah but the loss of [Foster Parents] from her life would be devastating to her.

2.      The effect of [a] change of caregiver, caretakers, and physical environment is likely to have on the child's emotional, psychological, and medical condition. Removing the child from the home and parents she knows and placing her with someone she does not even recognize as her mother would be devastating to Neveah emotionally, psychologically, and medically. The minor child has food allergies that [Mother] refuses to recognize, despite being told the information. [Mother] continues to bring food to visitation that Neveah should not eat.

3.      Whether the parent or guardian is paying child support consistent with the child support guidelines promulgated by the department pursuant to [Tennessee Code Annotated section] 36-5-101. The best interest of the child is determined from viewing this from the child's perspective rather than the parent's perspective. From Neveah's perspective, [Mother's] failure to pay support amounts to the same result whether that failure was willful or not. Child support payments are for the benefit of the child. A parent's failure to pay support for a child for whatever the reason impacts a determination of the child's best interest.

(Internal citation omitted).

Having carefully considered the evidence presented, we conclude that the proof does not preponderate against the trial court's factual findings. In addition to the three statutory factors the trial court focused upon, another factor supporting its finding that termination is in the child's best interest is that Neveah had already been adjudicated neglected and dependent and more than one of Mother's other children also had been adjudicated to be neglected and dependent. See Tenn. Code Ann. § 36-1-113(i)(6). We conclude, therefore, that the facts, viewed as a whole, amount to clear and convincing evidence that termination of Mother's parental rights is in Neveah's best interests.

## IV. Conclusion

For the reasons stated herein, we reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court terminating Mother's parental rights on the basis of the statutory factor enumerated in section 36-1-113(g)(14). As to all other issues, the judgment of the trial court remains intact and is reinstated as modified herein.

_____
CORNELIA A. CLARK, JUSTICE